**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**GEORGE W. TILMON IV**
**(Travis Co. # 1348824),**

        **Plaintiff,**

**-vs-**                                  **Case No. A-14-CA-499-SS**

**THE STATE OF TEXAS, TRAVIS COUNTY,**
**SHERIFF GREG HAMILTON, DETECTIVE**
**SCHRIDER, ALAN WILSON, MARK LNU,**
**KEVIN LEMOINE, DAVID WHITE, JUSTIN**
**RYBACKI, ADT SECURITY SYSTEMS, and**
**AT&T WIRELESS,**

        **Defendants.**

---

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE SAM SPARKS
        UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(f) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court is Plaintiff's complaint. Plaintiff, proceeding pro se, has been granted leave to proceed in forma pauperis.

PROCEDURAL BACKGROUND

At the time he filed his complaint pursuant to 42 U.S.C. § 1983, Plaintiff was confined in the Travis County Correctional Complex. Plaintiff's complaint is two-fold. Plaintiff complains about his conditions of confinement and the treatment he received in the Travis County Correctional

Complex after his last arrest on or about November 15, 2013.  In addition, Plaintiff complains of his pending criminal proceedings and all of the events leading up to his final arrest.

After consideration of Plaintiff's voluminous complaint, his complaint was severed into two complaints.  Plaintiff's claims relating to the conditions of his confinement and the treatment he has received in the Travis County Correctional Complex since his last arrest are contained in Cause No. A-14-CV-465-SS.  This case, Cause No. A-14-CV-499-SS, was opened for Plaintiff's claims regarding the events leading up to his final arrest and his pending criminal proceedings.  The defendants related to the claims in the instant cause are:  The State of Texas, Travis County, Detective Schrider, Alan Wilson, Mark LNU, Kevin Lemoine, David White, Justin Rybacki, ADT Security Systems, and AT&T Wireless.[1]

<u>PLAINTIFF'S ALLEGATIONS</u>

Plaintiff's complaint, including his declaration, totals 92 handwritten (though quite legible) pages. While the prose is perfectly coherent, the stories it tells are not always easy to follow.  Even more difficult to decipher is the legal significance of the facts he relates.  Thus, rather than attempting to parse the 97 pages, in this section the Court simply lays out, in summary form, the allegations more or less as Plaintiff states them in the complaint.

According to Plaintiff, he began courting Brittney Rybacki ("Brittney") in June 2011.  She allegedly informed Plaintiff her brother, Justin Rybacki ("Justin"), was moving to Austin and needed

---

[1]The defendants in the 465 case are: The State of Texas, Travis County, Sheriff Greg Hamilton, R. Johnson, Deputy Legeh, and Sgt. Bratchett.

a job.  Plaintiff hired Justin to work at his landscape company, Serene Scenes, LLC,[2] and provided him room and board.

In August, Plaintiff asserts he decided to take a trip to Mexico to scuba dive with his ex-fiancee, Sarah.  According to Plaintiff, Brittney did not care if Plaintiff took the trip.  Plaintiff claims he left Justin access to the company's bank account, e-mail account, and Toyota Tundra and arranged for the company's phones to ring on Justin's cell phone.

While in Mexico, Plaintiff asserts he received calls that his employees were stuck with no gas.  According to Plaintiff, his operations manager obtained the company's debit card and filled the gas for his lawn care crew.  Upon Plaintiff's return from Mexico, Plaintiff's phone was allegedly full of messages from angry clients, who had not been serviced.  Plaintiff asserts Justin picked Sarah and him up at the airport and made no mention of the problems.  Plaintiff claims he took control of the vehicle and debit card at that time.

Plaintiff alleges, upon his return home, he noticed a taser on the dining room table.  He also discovered his computer was on in his office and his chair cushion had been ripped, "indicating substantial time spent in boxers or otherwise in chair."  Plaintiff further discovered his Ford F250 was not parked in the front and his garage was empty of tools or personal property.

Plaintiff asserts he asked Justin what happened, and Justin replied, "that's not my responsibility."  According to Plaintiff, he called the Travis County Sheriff's Office to file a report for burglary, stolen vehicle, and theft.  Plaintiff also called his operations manager and was told Plaintiff's employees took the property, because they had not been paid.  According to Plaintiff, one

---

[2]Serene Scenes, LLC, was named as a plaintiff in this case.  On May 29, 2014, Serene Scenes was dismissed, because Plaintiff, a non-lawyer, cannot represent the interests of the company.

of his former employees denied any involvement but was later found to have pawned a few tools and received 30 days in jail.

Plaintiff asserts he filed a claim with his insurance company, which paid roughly $8,000 on the claim. Plaintiff estimates the total economic loss was $22,800.

Plaintiff indicates he wasted no time in firing the employees, who worked for him while he was on his trip to Mexico, and hired a new employee. Plaintiff indicates he and the new employee worked 10-12 hour days doing lawn care while waiting for his insurance claim to be paid.

After receipt of the payment, Plaintiff asserts he "fired up advertisement and closed a $26,000 project in West Austin." According to Plaintiff, Justin responded by shutting down the business's website, which Justin had built.

Plaintiff asserts, using remedial marketing, he was able to close another $60,000 in jobs and launched apparently a new site in late January or early February, presumably 2012. Plaintiff alleges Justin subsequently posted on Facebook that "George is a criminal!" According to Plaintiff, Brittney notified Plaintiff of the post, Plaintiff deleted it, and banned Justin from the site.

In March, Plaintiff asserts Brittney went through his phone and saw communications between Plaintiff and Sarah. Brittney subsequently left town and went to California. Upon her return 30-45 days later, Plaintiff asserts they resumed dating.

In the summer, Plaintiff's brother and his friend moved in with him and worked for Plaintiff during the summer. Plaintiff introduced Brittney to the family at a family reunion in July. Plaintiff left Brittney in charge of the company in August when Plaintiff went to Orlando with his brother to see him off to school. Upon Plaintiff's return, Brittney allegedly informed him her residential lease was up and she was ready to move in. Plaintiff allegedly asked for a week to make sure he was

4

emotionally ready, and at the end of the week, Brittney left for Las Vegas to stay with her sister for 45 days.  According to Plaintiff, Brittney returned in October and moved in with Plaintiff.

When Plaintiff was in Orlando, Plaintiff allegedly purchased a new cell phone, because he had noticed he previously had low bandwidth and limited battery life.  Upon his return, he claims he noticed the battery life and the heat on his phone was intensely lowered.  He also reviewed his data usage with his phone carrier.  As a result, his phone was reset to the factory default.

In November, Justin moved to Sacramento, California and urged Brittney to leave.  According to Plaintiff, Justin informed Brittney "it's about to get crazy."  Despite her brother's urging, Brittney allegedly decided to stay.

Plaintiff asserts he subsequently contacted his Internet provider to replace his router, explaining he had "slow data" and a "hacked box."  Plaintiff questioned Brittney about the Church of Scientology's reputation for "this type of stuff."  Plaintiff indicates he responded to Brittney that Justin is "capable by skill set."

In early December, Plaintiff claims he found a deposit receipt and a picture of a large sum of cash.  Brittney allegedly claimed it was her brother's and later stated it was payment for subletting her apartment.

Later that month, Plaintiff bought Brittney an iPhone and Brittney bought Plaintiff an iPad and both were added to the existing AT&T account.  Displeased with the loading time for data, Plaintiff asserts he put the iPhone and iPad in a backpack along with a router to give to a detective to file an Internet harassment claim.

In January, Plaintiff asserts Brittney's other brother, Shane, came to live with them and work for the landscaping company.  Sometime thereafter, Brittney apparently suffered from back pain and

Plaintiff took her to a chiropractor. According to Plaintiff, the chiropractor claims Brittney needed to see a doctor and would not adjust her. Plaintiff, on the other hand, got an adjustment.

Subsequently, Plaintiff and Brittney drove to Justin's apartment, because he had a moving company coming to take his belongings to California. Plaintiff explains they had to separate what items of Brittney's would be staying.

Later, on January 11, 2013, Plaintiff decided he, Brittney, and Shane should go out for dinner and drinks to try to improve Brittney's mood. Apparently, they just had drinks and returned home. Later, Plaintiff and Shane went to a fast food restaurant to buy breakfast. Meanwhile, Brittney took Plaintiff's phone and drove away in her car. They apparently returned home at the same time, and Brittney allegedly dug her fingers into Plaintiff's back and pushed him into the bedroom and began yelling at him. Plaintiff alleges he finished his breakfast and attempted to leave the room to get Brittney her plate. Despite her allegedly blocking the door, Plaintiff "juked" past her to retrieve the pancake platter. Brittney allegedly was in no mood to eat and instead climbed on Plaintiff and punched and scratched him. Plaintiff claims they eventually fell asleep.

Plaintiff claims he awoke at 10 am on January 12, and his contractors were outside waiting on him. He supposedly sent them out to their jobs and then asked Brittney to leave. Plaintiff admits he grabbed an armful of clothes and threw them out of the front door. While Brittney was scrambling to gather her belongings, Plaintiff allegedly put a collar on Brittney's dog and led the dog outside to Brittney. Plaintiff then changed the front and back door locks with a Quickset key and left to meet Shane for work, stopping at a convenience store for cigarettes and coffee.

Plaintiff asserts he and Shane began to return to the house but noticed someone from the Travis County Sheriff's Office was talking to Brittney. Plaintiff was pulled over a short time later.

6

Plaintiff asserts he was handcuffed and placed in the back of the deputy's vehicle.  According to Plaintiff, the deputy drove Plaintiff back home.  After an hour, the deputy allegedly asked Plaintiff if he would like to meet with a detective or go downtown.  Plaintiff claims he agreed to talk to Detective Schrider.  According to Plaintiff, he complained to Detective Schrider that his cuffs were too tight.  Subsequently, the cuffs were removed.  Plaintiff claims Detective Schrider asked if Plaintiff choked or stuffed a sock in Brittney's mouth.  Plaintiff denied he did and gave consent to search his house.

Plaintiff asserts he was returned home and a search was conducted.  According to Plaintiff, two laptops, four cell phones, belts, and other items were taken.  Plaintiff states he was given paperwork to call and collect his property when he was released, likely on a personal bond.

Plaintiff was denied a personal bond, and bail was allegedly set at $55,000.  Plaintiff was released on bond after six days in jail.  He asserts he had a GPS tracking unit attached to his left leg. The next morning he allegedly met with pretrial services to discuss his conditions of release.  Later that day, Plaintiff alleges he went to his bank to review his accounts and discovered identity fraud. According to Plaintiff, he opened new personal and business accounts.  After leaving the bank, Plaintiff went to an AT&T store and discovered someone had tried to "port away [his] phone number."  He added passwords and restrictions to his account.  He then retrieved his truck and went home.

Plaintiff claims, upon his arrival, it appeared someone had been staying in his house during his absence.  Plaintiff tried to resume his work but had difficulty because he did not have his computer.  He claims he phoned Detective Schrider the next day in order to retrieve his belongings. Detective Schrider allegedly declined to release the property at that time.

7

On January 30, 2013, Plaintiff asserts he installed four security cameras and a DVR system to protect his house and office space.  On February 1, 2013, while working on Kevin Lemoine's property, he was approached by an ADT representative.  Kevin Lemoine ("Lemoine") told Plaintiff what he liked about the ADT system, and Plaintiff scheduled an appointment with an ADT representative.

On February 7, 2013, Plaintiff asserts he received calls on his business line from two unknown numbers, and he declined to answer.  The following day, he allegedly received a call from Brittney and they began speaking on the phone regularly until the middle of May.  During the call on February 8, Plaintiff asserts he learned Detective Schrider had given Brittney one of the iPhones and the iPad that were taken during the search.  According to Plaintiff, an emergency protective order stated Plaintiff was not allowed to disconnect service to either of these devices.  Plaintiff asserts he continued to contact Travis County officials in order to retrieve his property.

Plaintiff continued to work on the Lemoine project during the month of February.  Plaintiff hired Lemoine's neighbor's son, Chris, and Lemoine's housekeeper, Mark, to join the project.

According to Plaintiff, Shane was allowed to start working for him again on February 22, 2013. The next day, Plaintiff asserts his pretrial services officer told him he was not charging his GPS unit enough and asked Plaintiff to have his attorney, David White, petition the judge to have the GPS device removed.

Subsequently, Plaintiff allegedly noticed emails with jpeg files that had been digitally altered and files and other things in his office had been adjusted.  These activities continued for a week, so Plaintiff contacted ADT for installation.

That same week Plaintiff claims he received a lawsuit, accusing the company of copyright infringement with regard to the site provided by Justin.  As a result, Plaintiff claims he shut down the site.  The following week, he "received indication of another law suit," which was filed by a victim of a car accident in which Justin was the driver.

Additionally, Plaintiff asserts he went to the attic to secure his DVR and noticed a piece of trim installed in his attic that came from Lemoine's house.  Later, he states he was watching movies on Lemoine's laptop and Plaintiff saw a flash of Sarah, his ex-fiancee, in the background.  Upon his return to his house, he allegedly saw visuals on his iPad from his security cameras.

Later on, Plaintiff discovered some of the work at Lemoine's house would have to be redone.  Due to Plaintiff's financial situation, he claims he had to do the work himself.  During this time, he allegedly confided in Lemoine about his problems.

The next evening, Plaintiff noticed white colored bugs on his face.  Mark, an ex-nurse, identified the parasite and told Plaintiff how to address it.

Subsequently, Plaintiff was arrested for not charging his GPS.  Plaintiff apparently was bonded out, and the device was removed.  Sometime thereafter, Plaintiff met with an ADT representative, and a security system was installed at Plaintiff's home.  Plaintiff believes Lemoine and his "team" were monitoring Plaintiff's cell phone, which was used to log into his new security system.

Plaintiff later had more problems with his employees and equipment and notified the Travis County Sheriff's Office.  He also took his AT&T equipment to a store, and it was replaced due to "irregular software and system activity."  Plaintiff asserts he discussed his equipment problems with Mark and Lemoine.  Plaintiff then experienced more banking problems.

Plaintiff asserts he appeared for court, but his attorney did not appear. Plaintiff was forced to wait, and as a result, his truck was towed. In his truck were his phone and wallet.

Later that week, Plaintiff installed a firewall and changed his computer network. Subsequently, Plaintiff alleges his house was broken into several times. In addition, he states the criminal charges against him were changed.

Plaintiff claims he experienced mild depression and slept for days. Upon waking, Plaintiff states his skin looked like it had been burned with cigarettes and rope and he believed he had been sexually assaulted. Unsure of his safety, Plaintiff explains he entered a Best Buy wearing only his boxers in order to attract the attention of the police. When they arrived, Plaintiff asserts he was arrested for deceptive trade practices and taken to jail.

Plaintiff subsequently bonded out of jail. Plaintiff asserts his house was broken into again. Plaintiff began to think he had previously been drugged and suspected Mark and Lemoine.

Someone by the name of Alan allegedly came by Plaintiff's residence and asked for a place to "crash." Plaintiff approved but later noticed activity on his computer network. Sometime in June, Plaintiff claims his account information was stolen, along with his passport and driver's license. Plaintiff attempted to withdraw funds from one of his accounts but was denied because he had no identification.

"Needing a break from the 'drama,'" Plaintiff booked a flight to Orlando. Plaintiff was arrested at the airport and charged with theft out of Williamson County, Texas. While awaiting transport, Plaintiff claims the Fire Marshal informed him his house and truck had been vandalized and his music studio had been burned down. The Williamson County charges were allegedly dropped after Plaintiff's father paid one of Plaintiff's customers $1,600.

10

Upon release from the Williamson County Jail, Plaintiff alleges he found his house had been burglarized and his property stolen. Plaintiff attempted to file a claim with his insurance company, but the company requested a police report be filed. Plaintiff allegedly contacted the Travis County Sheriff's Office, but detectives were "skeptical" of the claim.

Lemoine allegedly hired Plaintiff to do some additional work at his house. According to Plaintiff, Lemoine used Plaintiff's iPad to "capture" messages sent to Brittney and sent them to the Sheriff's Office to get a warrant issued.

The next day, Plaintiff asserts he purchased a four-wheeler to use as transportation. Plaintiff states he stopped by Lemoine's to show him his "new wheels" and then got stuck in Walnut Creek on his way home.

Later, Plaintiff noticed problems with his iPad. Lemoine apparently gave Plaintiff a ride from his house to Home Depot, and ten minutes after Lemoine left, Plaintiff was arrested.

Plaintiff met with his attorney and was offered three years probation. Plaintiff asserts he agreed in order to get out of jail. He wanted to move to Florida, but the probation department told him there is a process to follow and Florida would have to accept him.

Upon his release from jail, Plaintiff once again returned home to find it had been burglarized. He also discovered his insurance check for $12,000 had been cashed by his bank.

Plaintiff began to try to repair his house and intended to sell it. After meeting with the probation department and talking to his attorney, Plaintiff asserts he took a bus to the airport and flew to Orlando. Apparently, Plaintiff had a new phone and Lemoine began contacting him. Plaintiff states he planned to get a restraining order against him.

Although Plaintiff's complaint is not clear, it appears he returned to Texas and received a partial payment from his bank regarding the insurance check. Plaintiff used the proceeds to buy a one-way ticket to Los Angeles, California to "relax a little."

Prior to his California trip, Plaintiff asserts his attorney "dropped the case." He then hired Matt Shrum, who informed Plaintiff he was being investigated for stalking.

Later, while in the tub watching movies, Plaintiff asserts he saw Justin's face on his iPad. Plaintiff claims he flipped the iPad to hide the camera to shield his naked body. Knowing Justin was watching, Plaintiff asserts he searched random porn sites to get Justin to communicate with him. Plaintiff claims Justin communicated with Plaintiff through craigslist.

Plaintiff states he returned to Texas within a week upon learning of the stalking investigation. He believes on his drive back to Texas his device was monitored in each state, listening to his conversations and watching him through the camera.

Plaintiff believes Lemoine was stalking him, so he stopped at Lemoine's to talk to him. Lemoine was not there at the time, but they met later. That is when Plaintiff allegedly saw an image of Justin and Brittney on Lemoine's laptop.

The next day, Plaintiff was informed the bondsman was looking for him. Plaintiff was subsequently arrested and held without bail for two weeks. Plaintiff indicates he received a new charge for stalking. Plaintiff's sister reported Plaintiff's house had been broken into again. Plaintiff states he had difficulty filing a report with the Travis County Sheriff's Office.

Plaintiff next begins to summarize his extended stay in the Travis County Correctional Complex, which is relevant to his lawsuit in Cause No. A-14-CV-465-SS, and will not be discussed here.

12

DISCUSSION AND ANALYSIS

A.    Standard Under 28 U.S.C. § 1915(e)

An in forma pauperis proceeding may be dismissed sua sponte under 28 U.S.C. § 1915(e)

if the court determines the complaint is frivolous, malicious, fails to state a claim upon which relief

may be granted or seeks monetary relief against a defendant who is immune from suit.  A dismissal

for frivolousness or maliciousness may occur at any time, before or after service of process and

before or after the defendant's answer.  Green v. McKaskle, 788 F.2d 1116, 1119 (5th Cir. 1986).

When reviewing a plaintiff's complaint, the court must construe plaintiff's allegations as

liberally as possible. Haines v. Kerner, 404 U.S. 519 (1972).  However, the plaintiff's pro se status

does not offer him "an impenetrable shield, for one acting pro se has no license to harass others, clog

the judicial machinery with meritless litigation and abuse already overloaded court dockets."

Farguson v. MBank Houston, N.A., 808 F.2d 358, 359 (5th Cir. 1986).

B.    Eleventh Amendment Immunity

The State of Texas is immune from suit.  The Eleventh Amendment provides that the State

of Texas, as well as its agencies, are immune from liability.  Kentucky v. Graham, 473 U.S. 159, 167

(1985).  In Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989), the Supreme Court

held that "neither a State nor its officials acting in their official capacities are 'persons' under

§ 1983."  Accordingly, Plaintiff's claims against the State of Texas should be dismissed without

prejudice for want of jurisdiction.

Additionally, the Court notes Plaintiff claims against the State appear to be related to his

pending criminal case.  For instance, Plaintiff generally alleges his Sixth Amendment rights have

been violated by "refusing to give plaintiff his right to speedy public trial, failing to inform Plaintiff

of the nature and cause of the accusation, giving him the opportunity to confront witnesses against him, removing the compulsory process for obtaining witnesses in his favor and by forcing counsel after an oral request to dismiss and proceed pro se." In addition, Plaintiff complains his Eighth Amendment rights have been violated by the imposition of excessive bail and finds. However, Plaintiff's claims challenging his pending criminal cases are not appropriate in this case.

 C. <u>Non-State Actors</u>

 Plaintiff names seven defendants that are private persons or entities. They are Mark LNU, Alan Wilson, Kevin Lemoine, Justin Rybacki, David White, AT&T Wireless, and ADT Security Systems.

 Plaintiff alleges Mark manipulated his router, cell phone, iPad, personal computers, and security system with the intent to stalk, track, and steal information. He further alleges Mark caused damage to baseboards, drywall, paint, and ceiling texture. Additionally, he alleges Mark, among other things, did half-hearted labor, installed a piece of trim in Plaintiff's attic, removed personal and business credit identifiers, and destroyed important business documents.

 Plaintiff alleges Wilson purposefully installed power shell server environments on Plaintiff's personal and business computers, causing Plaintiff operating difficulties. Plaintiff further alleges this resulted in a decline of Plaintiff's business.

 With respect to Lemoine, Plaintiff alleges he coordinated and solicited the actions of Mark and Alan. He believes Lemoine used his access to transmit images of Plaintiff's sexual explorations. Plaintiff accuses Lemoine of organizing a burglary of Plaintiff's house to destroy evidence. Plaintiff also alleges Lemoine provided information to the Travis County Sheriff's Office, which led to Plaintiff's arrest.

Plaintiff alleges Rybacki encouraged Lemoine's activities.   He further alleges Rybacki directed negligence as an employee of Plaintiff's landscaping company and coordinated harassment against Plaintiff.

With regard to David White, Plaintiff alleges he provided below average care to Plaintiff's criminal case.  Specifically, Plaintiff alleges White failed to show up to court on two occasions, told Plaintiff the court does not care about certain evidence, and failed to address Plaintiff's civil cases in a criminal venue.

Plaintiff claims AT&T Wireless disregarded his security and his service lines.  Similarly, he claims ADT Security Systems showed indifference to his security concerns.

The provisions of 42 U.S.C. § 1983 state that every person who acts under color of state law to deprive another of constitutional rights shall be liable to the injured party.  A civil rights plaintiff must show an abuse of government power that rises to a constitutional level in order to state a cognizable claim.  Love v. King, 784 F.2d 708, 712 (5th Cir. 1986);  Williams v. Kelley, 624 F.2d 695, 697 (5th Cir. 1980), cert. denied, 451 U.S. 1019 (1981).  Section 1983 suits may be instituted to sue a state employee, or state entity, using or abusing power that is possessed by virtue of state law to violate a person's constitutional rights.  See, Monroe v. Pape, 365 U.S. 167, 184 (1961); accord, Brown v. Miller, 631 F.2d 408, 410-11 (5th Cir. 1980).  A private person may be amenable to suit only when the person is a willful participant in joint action with the State or its agents. Dennis v. Sparks, 449 U.S. 24, 27 (1980).  To prevail on a Section 1983 conspiracy claim against an otherwise private party, the plaintiff must allege and prove an agreement between the private party and persons acting under color of state law to commit an illegal act and an actual deprivation of the

plaintiff's constitutional rights in furtherance of that agreement.  See, Hale v. Townley, 45 F.3d 914, 920 (5th Cir. 1995).

None of these six parties are state actors.  Plaintiff's allegations are not sufficient to show there has been a conspiracy to violate his constitutional rights.  As such, Plaintiff's civil rights claims against Defendants Alan Wilson, Mark LNU, Kevin Lemoine, David White, Justin Rybacki, ADT Security Systems, and AT&T Wireless fail to state a claim upon which relief can be granted.

D.    Detective Schrider

Plaintiff alleges Detective Schrider knowingly and intentionally provided false information to the grand jury and the district attorney's office, which resulted in several charges and arrests to be made against Plaintiff.  Plaintiff believes Schrider's actions were done without "policing" the allegations Lemoine provided him under the identity of Brittney.  Plaintiff contends:

> [A] normal or reasonable detective's activities would show upon his findings of evidence that countered his baracious [sic] effort: he did knowingly and intentionally withhold said findings from the courts in an intentional effort to snub any attempts to provide a reasonable review of the truth.  Defendant upon Notification of illegal siezure [sic] did knowingly and intentionally cause unnecessary delays in the return of company property resulting in heavy losses of clients and revenue from lost contracts.  Upon information and belief Defendant has been found to unnecessarily associate Mr. Tilmon in a popular murder case (local fire fighter murder) and proactively slader [sic] Mr. Tilmon to Brittney Rybacki in saying 'he fake cried' and 'he's coming to come after you, you know that don't you" in an attempt to manipulate and coerse [sic] her into making a statement.  Defendant also did knowingly and intentionally secure a warrant without probable cause or/and any information that could be used in a conviction and had Mr. Tilmon arrested on personal request for a charge [that will be dismissed upon review by State of his inconsintant [sic] statements] given the ongoing and malicious nature of the Defendant's actions that all were done while acting under the color of the state law.

Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands

more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." Bell Atlantic v. Twombly, 550 U.S. 544, 555-57 (2007).  Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id., 550 U.S. at 570. The Supreme Court states this plausibility standard is not simply a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The standard is guided by "[t]wo working principles." Id.  First, although "a court must accept as true all of the allegations contained in a complaint," that "tenet" "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.  Second, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

After review of Plaintiff's complaint, the Court is of the opinion Plaintiff has failed to state a claim upon which relief can be granted against Defendant Schrider. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend. IV.  By its plain terms, the Fourth Amendment does not prohibit all searches and seizures--only those that are "unreasonable." Illinois v. Rodriguez, 497 U.S. 177, 183 (1990); Bell v. Wolfish, 441 U.S. 520, 558 (1979).  To establish a constitutional violation based on false arrest, Plaintiff must show the arresting officers did not act with probable cause.  Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001) (explaining that persons enjoy the constitutional right to be free from false arrest without probable cause); Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001) (same).  Probable cause exists "when the totality of the facts and

17

circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." Glenn v. City of Tyler, 242 F.3d 307, 313 (5th Cir. 2001) (quoting Spiller v. Texas City, 130 F.3d 162, 165 (5th Cir. 1997)).

Once "facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest." Taylor v. Gregg, 36 F.3d 453, 456 (5th Cir. 1994) (citing Wheeler v. Cosden Oil & Chem. Co., 744 F.2d 1131, 1132 (5th Cir. 1984)). False arrest claims may nevertheless be maintained if the plaintiff affirmatively shows that "the deliberations of that intermediary were in some way tainted by the actions of the defendants." Taylor, 36 F.3d at 457 (quoting Hand v. Gary, 838 F.2d 1420, 1427 (5th Cir. 1988)).

Plaintiff's conclusory allegations do not allege facts showing the grand jury deliberations were tainted. In addition, as admitted by Plaintiff, he has multiple indictments pending against him, refuting his claim probable cause did not exist.

E.    Sheriff Greg Hamilton

Plaintiff seeks to hold Sheriff Hamilton liable for actions taken by Travis County employees. Plaintiff makes clear his claims are directed at Sheriff Hamilton in his supervisory capacity. However, supervisory officials cannot be held vicariously liable under § 1983 solely on the basis of their employer-employee relationship. Monell v. Dep't of Soc. Serv., 436 U.S. 658, 693 (1978); Lozano v. Smith, 718 F.2d 756, 768 (5th Cir. 1983). If a supervisor is not personally involved in the alleged constitutional deprivation, he or she may only be held liable if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. Thompkins

v. Belt, 828 F.2d 298, 303–04 (5th Cir. 1987).  Plaintiff has failed to allege a valid constitutional claim against Defendant Hamilton.

       F.      County Liability

Likewise, Plaintiff's claims against Travis County fail.  A political subdivision cannot be held responsible for a deprivation of a constitutional right merely because it employs a tortfeasor; in other words a local government unit cannot be held responsible for civil rights violations under the theory of respondeat superior.  Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992).  The standard for holding a local government unit responsible under § 1983 requires that there be a custom or policy that caused the plaintiff to be subjected to the deprivation of a constitutional right.  Id.; Collins v. City of Harker Heights, Tex., 916 F.2d 284, 286 (5th Cir. 1990), aff'd, 503 U.S. 115 (1992).  Thus, Travis County would violate an individual's rights only through implementation of a formally declared policy, such as direct orders or promulgations or through informal acceptance of a course of action by its employees based upon custom or usage.  Bennett v. City of Slidell, 728 F.2d 762, 768 (5th Cir. 1984), cert. denied, 472 U.S. 1016 (1985).  A single decision made by an authorized governmental decisionmaker to implement a particular course of action represents an act of official government "policy." Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986).

In this case, Plaintiff fails to allege a municipal policy was the moving force behind the alleged constitutional violations.  Plaintiff failed to identify a policy, practice or custom of Travis County that caused a deprivation of his constitutional rights.  Travis County is therefore not subject to liability under § 1983.

G.      Supplemental Jurisdiction

Though it is not entirely clear, Plaintiff may also be asserting state law claims.  Pursuant to 28 U.S.C. § 1367, a district court generally has supplemental jurisdiction over claims that are so related to claims in the action over which it has original jurisdiction that they form part of the same case or controversy.  However, a district court may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction.  Because the dismissal of Plaintiff's federal claims is recommended, the District Court should decline to exercise supplemental jurisdiction over any state law claims that may be contained in the complaint.

RECOMMENDATION

It is therefore recommended that Plaintiff's claims brought against the State of Texas be dismissed without prejudice for want of jurisdiction.  It is further recommended that the remainder of Plaintiff's federal claims be dismissed with prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915(e).  It is finally recommended that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims, if any.

It is further recommended that Plaintiff be warned that if Plaintiff files more than three actions or appeals while he is a prisoner which are dismissed as frivolous or malicious or for failure to state a claim on which relief may be granted, then he will be prohibited from bringing any other actions in forma pauperis unless he is in imminent danger of serious physical injury.  See 28 U.S.C. § 1915(g).

In the event this Report and Recommendation is accepted, adopted or approved, it is recommended that the Court direct the Clerk to e-mail a copy of its order and judgment to the Pro Se Clerk for the United States District Court for the Eastern District of Texas.

20

OBJECTIONS

Within 14 days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636 (b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained within this report within 14 days after service shall bar an aggrieved party from de novo review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc); Thomas v. Arn, 474 U.S. 140, 148 (1985); Rodriguez v. Bowen, 857 F.2d 275, 276-277 (5th Cir. 1988).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 23rd day of March, 2015.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE